# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| Thomas B., | ) | |
| | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50158 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|    *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, now 54 years old, is seeking Social Security disability benefits based primarily on his psychiatric problems. For several decades, he has experienced an array of emotional and cognitive difficulties, including hallucinations (seeing shadows and ghosts), anger episodes, depression, difficulties reading and writing, a learning disability, memory issues, sleep problems (not getting more than 4 hours a night), and social difficulties. He has served time for attempted armed robbery and has had drug and alcohol problems. He has only worked sporadically, and does not appear to have any active family support.

Despite these longstanding problems, he received little or no treatment until several months after filing his disability application. In March 2017, he started treatment at Rosecrance. Dr. Shahina Jafry, a psychiatrist, diagnosed him with schizoaffective disorder, bipolar type.[1] She prescribed Seroquel, Remeron, and Trileptal and saw him every three months or so to manage these medications. On a parallel track, Plaintiff participated in group and individual counseling

---

[1] According to the Mayo Clinic website, schizoaffective disorder "is marked by a combination of schizophrenia symptoms, such as hallucinations or delusions, and mood disorder symptoms, such as depression or mania." Mayo Clinic, Schizoaffective disorder, https://www.mayoclinic.org/diseases-conditions/schizoaffective-disorder/symptoms-causes/syc-20354504 (last visited Dec. 18, 2020).

1

with Rosecrance therapists. The collective Rosecrance treatment records, covering about a year of treatment, constitute the bulk of the evidence in this case. In May 2018, Dr. Jafry completed a questionnaire indicating that Plaintiff had marked limitations in numerous categories. Ex. 11F. If fully credited, this opinion would mean that Plaintiff should be found disabled.

Plaintiff was also evaluated by several state agency physicians. The ALJ did not rely on these opinions in any meaningful way, and they are not relevant for the current arguments. Plaintiff was also evaluated by two consultative examiners. On January 13, 2017, Dr. Ramchandani examined Plaintiff and issued a report. Ex. 5F. Although this report is not an especially important piece of evidence for the current arguments, it will be discussed at one point below. On December 13, 2016, psychologist Julie Young interviewed Plaintiff, performed cognitive tests, and issued a report. Ex. 4F. Her report is much more significant. She concluded that Plaintiff was purposefully exaggerating his problems and diagnosed him with antisocial personality disorder. Dr. Young's and Dr. Jafry's assessments are starkly different.[2]

In July 2018, the ALJ issued his ruling finding that Plaintiff could do light work subject to physical and mental RFC limitations. At Step Two, the ALJ found that Plaintiff's schizoaffective disorder qualified as a severe impairment. In evaluating the Paragraph B criteria as part of the listing analysis, the ALJ found that Plaintiff had moderate limitations in the first three categories and mild limitations in the fourth one. The analysis was the same for each category. The ALJ first acknowledged that Plaintiff had severe problems, but then concluded that he made "significant improvement" after taking the medications prescribed by Dr. Jafry.

The RFC analysis contains two main parts. The first is the credibility analysis. The ALJ found that Plaintiff was not "entirely credible" because (1) he "fails to put forth effort and

---

[2] No expert was called to testify at the administrative hearing.

exaggerates deficits on examination" and (2) "his schizoaffective disorder shows significant improvement on medication." R. 24. The first assertion is based on Dr. Young's report. The second assertion relies on the Rosecrance treatment notes and on one statement taken from Dr. Jafry's opinion.

The second part of the RFC analysis addresses the medical opinions. The ALJ did not specifically discuss Dr. Young's report here, and as noted above, the State agency opinions are not relevant. This leaves only Dr. Jafry's opinion, which the ALJ analyzed as follows:

> With respect to Dr. Jafry's medical source statement, I give this opinion some weight, but the form largely consists of a checkbox form noting marked limitations in all areas (11F). Notably, Dr. Jafry states: "With compliance on meds mood swings under control, no panic attacks" (11F/1). The marked or extreme limitations contained in the report fail to reflect the significant improvement the claimant has experienced on medication, as well as the claimant's plan to seek employment that may be affected by factors beyond his impairments. As a result, I give little weight to the marked or extreme limitations noted in this report.

R. 28. To condense this explanation a bit, it contains three rationales—the checkbox form, significant improvement, and looking for work.

## DISCUSSION

Plaintiff raises multiple arguments for remand, but the principal one is that the ALJ erred in rejecting the opinion of Dr. Jafry, a treating physician. The Court finds this argument persuasive and will discuss it in Section II. But first the Court will discuss the potential role Dr. Young's report may have played in the ALJ's thinking. This issue relates to the credibility analysis, which Plaintiff argues was cursory and confusing. In Section III, the Court will offer a few concluding observations.

### I.     Credibility, Exaggeration, and Malingering

Dr. Young's report occupies an ambiguous role in the ALJ's decision. To explain why, we need to first describe the report in greater detail. Dr. Young set forth several conclusions (or

3

one might call them observations) at the end of her report. She stated that Plaintiff only described "vague mental symptoms." R. 322. As an example of this vagueness, she noted (earlier in her report) that Plaintiff claimed that he had mood swings but then he "could not quantify how long he stays in one mood." R. 319-20. Dr. Young noted that Plaintiff had "a lengthy history of rule violation." R. 322. This statement was presumably based on Plaintiff's own descriptions of his criminal history. Finally and most significantly, Dr. Young stated that Plaintiff "gave little effort and exaggerated his deficits" and that she observed "deception" during his evaluation. *Id.* Based on this conclusion, Dr. Young further surmised that "[i]t is likely [Plaintiff] exaggerated any mental health problems he reported as well." *Id.* She concluded that Plaintiff's symptoms were consistent with antisocial personality disorder.[3] She did not consider the possibility that Plaintiff might have had schizophrenia or bipolar disorder, even though he told her he had wondered whether he had these illnesses and even though he told her he had a family history of schizophrenia, bipolar disorder, and substance abuse. R. 320.

Earlier in her report, Dr. Young summarized the cognitive tests she administered to Plaintiff. The Court will quote this summary in full, despite its length, because it presents a vivid picture:

> **Mental Status:**
> The claimant recalled his date of birth correctly. He recalled the date as "the 13th." He recalled the [month] as the "12th month." When asked the name of that month, he said, "October. No November." He recalled the year as "2017, 2016." He recalled the day of the week as "Monday. Tuesday." He struggled to recall the current president as "I'm not sure." When asked to recall the former president, he said, "I forget." When asked to recall two current events, he said, "What do you mean by that?" It was explained to him and he still could not think of anything. When asked to name 5 major U.S. cities, he said "I don't know." When given Chicago as a clue, he continued to say he did not know any cities. When asked to recall 5 living celebrities, he said, "I don't know. The only ones I know are dead, like Michael Jackson, and Prince." The claimant was asked to recall four words

---

[3] According to the DSM 5, one feature of antisocial personality disorder is "deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure." DSM-5, 301.7.

> (apple, table, penny and dog), and after they were presented to him, he said, "Could you say that again?" They were repeated again and he said, "Apple. (delay) Dog. (delay)." They were repeated again, and he replied "Dog." They were repeated again and he was told to remember them for later recall. After a 5 minute delay, he was asked to recall them and said "7 or 3 or something." He was reminded that he was told four words, and then he recalled more numbers. The claimant was given clues to assist him and he recalled the fruit as "broccoli or carrots," the furniture as, "chair or couch," the coin as "a gold coin or silver coin," and the animal as "cat or rat." The claimant was given a clue to assist him, and he recalled the coin as "penny" and the animal as "dog." The claimant recalled 0 digits forward (3-2-7-9 as "4-3-9." 3-4-1 as "4-1" 2-4 as "4-2.") and digits backwards (3-9 as "1-3." 1-7 as ["]8-2"). He solved the following simple math problems: "2+2=3, 3+4=I don't know, 9-3=I don't know, 11-4=I don't know, 2x4=I don't know.["] He spelled the word world forward as "I don't even know." When asked to spell the word "fight," he said, "I don't know how to spell that either." When asked how a piano and a drum are alike, he said "Are they the same?" When given the clue, "They are types of", he replied, "I don't know. They are different." When asked how carrots and broccoli are alike, he said, "You eat them. Meat." When asked how a boat and an automobile are alike, he said "I don't know." When asked the meaning of *Don't cry over spilt milk*, he said, "I don't know." When asked the meaning of *The grass is always greener on the other side of the fence*, he said, "I don't know." When asked what he should do if he discovered a fire in a theater, he said, "Sit there and watch the movie." When asked what he should do if he found an envelope on the ground, he replied, "Leave it There." The claimant was asked four simple questions to determine the authenticity of his impairment. He answered all of these questions incorrectly.
>
> It is the evaluator's opinion that the claimant **does not** need assistance in regards to managing funds if awarded benefits.

R. 321-22 (bolding and italics supplied by Dr. Young).

Dr. Young clearly believed that Plaintiff's extremely poor performance on these tests resulted from his purposeful exaggeration. As noted above, she stated later in her report that she believed he was exaggerating and engaging in deception. She also found that he was fully capable of managing an award of benefits even though he literally could not add two plus two. Although Dr. Young did not use the word malingering, her entire report inescapably points in that direction, and we will use this term from here on out as a shorthand.

5

Why did Dr. Young think Plaintiff was malingering? The answer is not readily apparent because Dr. Young provided little analysis. At the end of the long paragraph quoted above, Dr. Young gnomically stated that she asked Plaintiff "four simple questions" and that he answered them all "incorrectly," thus allowing her to "determine the authenticity of his impairment." But she did not describe what the questions and answers were or otherwise explain precisely what led her to believe that Plaintiff was engaging in deception. It may be that she relied on her professional intuition and concluded that Plaintiff's performance was so egregiously bad that it was simply not credible on its face. But whatever the reason, Dr. Young's malingering finding presented a significant obstacle to Plaintiff's case. On the other hand, if Plaintiff was not malingering, then his poor performance would seem to cut in the other direction, providing strong support for his claim. In short, the malingering issue was a large fork in the road.

But the problem with the malingering finding is that there is contrary evidence suggesting that Plaintiff's poor performance was not an aberration. That is, Plaintiff made similar statements to other evaluators and treaters, and it does not appear that any of them detected or suspected he was faking. In fairness to Dr. Young, she evaluated Plaintiff before much of this evidence was available. Still, this contrary evidence should be confronted before any malingering rationale is relied upon. The Court will not discuss all this evidence, but will set forth a few examples to make the point.

In January 2017, Dr. Ramchandani observed that Plaintiff was "unable to recall current and past presidents," was "unable to do serial seven's," and "did not know the meaning of do not cry over spilled milk or the grass is greener on the other side of fence, and did not know the difference between a bush and a tree." R. 325. These responses were similar to those given to Dr.

Young just a month earlier. However, Dr. Ramchandani did not give any indication that he thought Plaintiff's responses were not genuine or that he was giving little effort.

On March 31, 2017, Plaintiff saw Karen Maher, a nurse practitioner who had seen Plaintiff before. In her notes, she described the following confusing exchange with Plaintiff about the location of a pharmacy:

> Last visit amitriptyline, tizanidine and ibuprofen were ordered and patient was informed
> Patient now states he was unaware of the prescriptions that were ordered
> Instructed patient that the medications were called in to Walgreens on State and 9th.
> He states "so there is no way that you can prescribe me the tramadol, you know the stuff that makes you feel alive again?"
> He then asked if there was a 'cover charge' for the prescriptions
> I informed him that he could go to the Walgreens downstairs and have them pull rx's through computer and see if there was a cost
> If there was, he could then go upstairs to Community Connection for assistance
> He asked if I meant the Walgreens when you first walk in the building
> Patient instructed yes, Crusader walgreens
> Within 1 minute while provider typing, patient then asks if prescriptions were at the Walgreens at State and 9th
> Instructed yes, but go downstairs to see if they can get information about cost for you
> Patient then says, "there is a Walgreens here? I didn't even see one when I came in"
> Denies any acute illness

R. 353. The fact that Ms. Maher took the time to document this lengthy exchange in such detail suggests that she found the encounter noteworthy. But she did not indicate here (or anywhere else insofar as the Court can tell) that she believed that Plaintiff was putting on an act.

Also in March 2017, Plaintiff was assessed by counselors at Rosecrance. In their report, they noted that Plaintiff had "difficulty giving the year, time or president" and concluded that he had a "very poor memory." R. 425-26. Here again, these evaluators did not express any concerns about malingering. They did note that Plaintiff was "a poor historian and has low insight" and

7

that "he struggled to identify what was occurring." R. 434. But their assessment seems to attribute this problem to Plaintiff's mental impairments.

At the administrative hearing, Plaintiff's testimony was likewise confusing or vague in several instances. The following exchange is one example:

> Q   Okay. So as far your physical abilities now do you have a sense of how much—in weight you are able to lift?
>
> A   Not too much like I used to? I used to, years ago—I can't lift too much. It all depends. Maybe five, ten pounds, somewhere around that mostly. Before—anything over that it will start hurting more. I used to run across the street with a pair of barbells. Now I can't, you know, barely lift the seat part or the barbells.
>
> Q   Okay. And how about standing? Is that a problem?
>
> A   Yes, it is sometimes. And then, you know, I played football, wrestling, went across the monkey bars, got knocked out a couple of times when I'm trying to reach the seventh or eighth bar. Tall. You know, a guy had to be—I had to reach a bar to try a stunt like that. But I did it anyway.

R. 87. It is not easy to follow Plaintiff's chain of thought here.

The record contains many examples where Plaintiff struggled to remember basic facts about his life or his physical and mental problems. For example, he was unable to give even rudimentary details about his time in prison. *See* R. 319 (Dr. Young's report: "He does not recall how long he was in jail to serve his sentence."); R. 91 (when asked at the hearing how long he was in prison, he answered: "I forget a lot, years and dates and days."). While the Court is hesitant to rely on the Hollywood clichés about prisoners counting the days of their term by putting marks on their cell walls, one still has to wonder why Plaintiff could not even make a ballpark guess about how much time he spent in prison or how long ago it was. He also seemed to have a surprising lack of recall about other important events, such as when he went to the hospital ("I don't remember. I really don't remember.") or when he got into fights ("I forgot. I forgot the date and the time, but it happened."). R. 107.

One possible response to these lapses is to argue that Plaintiff was deliberately feigning memory problems to hide embarrassing facts that might be detrimental to his disability claim. But this conclusion is belied by Plaintiff's general willingness to disclose, and arguably exaggerate, his problems. At the March 2017 Rosecrance assessment, he stated: "I got a [criminal] record probably longer than me standing." R. 425. He told Dr. Young that he "drinks alcohol 'whenever I can get my hands on it.'" R. 320. He confessed to getting into fights, having problems with domestic violence with the mother of his two children, getting a DUI, and other unflattering facts. The willingness to readily confess to these problems (while at the same time recalling very little information about them) suggests that if he were exaggerating, he was doing so across the board rather than in a selective way more consistent with malingering.

We have only summarized some of this contrary evidence. Plaintiff's opening brief sets out a bullet point list of more evidence along this line. *See* Dkt. 18 at 11. The Court is not claiming that the issue of whether Plaintiff was malingering can be, or should be, resolved here, but is merely holding that the evidence must be considered fully and fairly. It was not. The Seventh Circuit has warned ALJs about the danger of too quickly jumping to a malingering conclusion, especially when the claimant has a complex psychiatric illness. *See Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("Spiva's being vague or evasive when questioned about his illness could be evidence of malingering, but equally could reflect the effects of his psychotic mentation.").

All of this leads to the final critical question—did the ALJ actually rely on Dr. Young's malingering rationale? Surprisingly, this question is not easy to answer. An argument could be made that the ALJ did *not* rely on it. The ALJ did not find that antisocial personality disorder (Dr. Young's diagnosis) constituted a severe impairment at Step Two, but there was little

9

discussion regarding this diagnosis. The ALJ did not discuss Dr. Young's report in the analysis of the medical opinions. And the ALJ made a statement at one point that the Rosecrance treatment records provided a "more accurate reflection" of Plaintiff's condition than did Dr. Young's report. R. 26. The ALJ did not further explain this statement, however.

On the other hand, the ALJ specifically stated at the start of the credibility discussion that he found Plaintiff not credible because he "fails to put forth effort and exaggerates deficits on examination." R. 24. This statement is taken almost verbatim from Dr. Young's report. The ALJ's direct endorsement of these malingering findings is fairly strong evidence that the ALJ was relying on them to some extent. At a minimum, there is an ambiguity on this important issue. As Plaintiff notes, the ALJ's position regarding Dr. Young's report is "hard to follow." Dkt. 18 at 11. This Court agrees. The possibility that the ALJ may have believed Plaintiff was malingering is not a conclusion that can be lightly dismissed as surplusage because it could have covertly contaminated the ALJ's later analysis, including the finding of improvement. *See Potega v. Berryhill*, 16-CV-50110, 2017 WL 2461549, *4 (N.D. Ill. June 7, 2017) (malingering is a serious charge, carrying with it the potential to "dominate all [other arguments] like the proverbial skunk thrown in the jury box"). In this Court's view, Dr. Young's and Dr. Jafry's assessments are polar opposites. One or the other must prevail. They cannot be easily reconciled by taking a belt-and-suspenders approach. But the ALJ's decision never confronts this fundamental tension, leaving the reader in limbo. The fact that neither this Court nor Plaintiff is clear about these questions is a reason for remand. As Plaintiff notes, the ALJ did not discuss the other credibility factors in SSR 16-3p and did not offer any other substantive rationale for the credibility finding. In sum, without Dr. Young's findings, the ALJ's credibility finding has little else to stand on.

## II. Dr. Jafry's Opinion

Even if these concerns about the ambiguous malingering finding could be overlooked, a remand would still be required because the ALJ's rationales for rejecting Dr. Jafry's opinion are inadequate. The first and third rationales are at best minor points. The second rationale is more substantive in theory, but it still suffers from cherrypicking and doctor playing. In particular, the ALJ failed to consider several important factors the Seventh Circuit has noted in cases involving complex mental illnesses.

**Rationale #1—Checkbox Form.** The ALJ stated that Dr. Jafry's opinion "largely consists of a checkbox form." Although it is not clear how much weight the ALJ placed on this observation, it is only a mild criticism, and one that opens the ALJ up to the counter-attack of hypocrisy.

To provide some background, the questionnaire completed by Dr. Jafry was six pages. Although it did include checkbox questions, it also included free-form questions where open-ended answers could be provided. And in fact, Dr. Jafry provided handwritten answers, although they were just a few lines. So, although one could describe this as a checkbox form, it was not entirely so. The ALJ's hedge word "largely" implicitly acknowledges this point.

The more substantive rejoinder is that ALJs routinely rely on state agency physician opinions, which have similar levels of detail and which therefore should all be rejected if this rationale were to hold sway. The checkbox criticism might have more traction if the ALJ were relying on a contrary, more detailed, non-checkbox opinion. But here, Dr. Jafry's opinion was the only game in town so to speak because the ALJ did not rely on any other opinion. For these reasons, this first rationale has only marginal probative value. Clearly much more is needed to reject a treating physician opinion.

**Rationale # 2—Improvement.** This is the most substantive rationale and the central pillar upon which the entire decision rests. This rationale has a foothold in the evidentiary record and perhaps may be viable on remand if developed more fully. Both sides agree that Plaintiff improved somewhat after taking medications. But as is often the case, a dispute exists over the degree of the improvement, with both sides marshalling pro and con arguments. Of course, to the extent that these arguments boil down to a choice between two competing but reasonable interpretations, then this Court would be obligated to defer to the ALJ's choice. *Beardsley v. Colvin*, 758 F.3d 834, 836-37 (7th Cir. 2014). Plaintiff argues, however, that the ALJ's analysis was incomplete and relied too heavily on a layperson analysis. This Court agrees.

Plaintiff's main complaint is a vagueness argument. Plaintiff argues that the ALJ only loosely and imprecisely described the degree of improvement. Plaintiff complains that the ALJ did not establish a baseline, or starting point, to measure how much Plaintiff improved. Under this theory, a claimant might make significant improvement, just as the ALJ concluded Plaintiff did here, but still fall short of the standards needed to do light work full-time, similar to the way a struggling student might greatly improve during the semester but still get only a C for the course. Plaintiff cites to several cases relying on similar arguments. *See, e.g. Salazar v. Colvin*, 13-C-9230, 2015 WL 6165142, *4 (N.D. Ill. Oct. 20, 2015) ("The ALJ's reliance on the stated 60% improvement is meaningless because she failed to establish a baseline from which the stated improvement can be measured."); *Antonio P. v. Saul*, 19-CV-375, 2020 WL 1910345, *14 (N.D. Ind. Apr. 20, 2020) ("the 'baseline level of stability' for plaintiff who had paranoia and hallucinations, was not the baseline normal and could have constituted baseline disability."). Plaintiff was asked at the hearing about his typical day, and he stated that he mostly stayed at

home, "taking [his] meds and just staying in." R. 100. He then contrasted this more sedate lifestyle with the one years earlier, which he described as follows:

> You know, running in the streets, drinking and hanging around bushes and trees and under bridges and all that, trying to drink as much as the liquid flowing, the river flow. You know. I just change all of a sudden. I'm just—mostly in my apartment. I'm not homeless like I used to be.

*Id.* This quotation suggests a very low baseline, meaning that Plaintiff may have still had a "great distance" to travel to get to the level to allow him to work 40 hours a week. *See Meuser v. Colvin*, 838 F.3d 905, 913 (7th Cir. 2016) ("Regarding the effectiveness of the medication, it is true that [the claimant] reported that he was 'doing pretty well,' had more energy, was sleeping better, and was getting out of the house more. But '[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce.'").

Plaintiff's argument is not just that the ALJ was vague in terms of the degree of improvement, but also that the ALJ lumped together many wide-ranging symptoms into one big analytical bucket. The Court agrees that a more fine-grained, symptom-by-symptom analysis would provide more clarity. Even if it is true that Plaintiff reported improvement in some areas, for example he said he was sleeping longer than four hours a night and was not "acting out" and "cussing and fussing" as much (R. 413), this does not mean that all of his symptoms improved, or at least not all to the same degree. Plaintiff testified at the hearing that significant problems remained even after taking the medications. He was still experiencing hallucinations, some involving ghosts and skeletons, "[a]ll the time," and he stated that these voices would sometimes tell him to do things that "would probably get [him] in trouble or [] locked up in prison." R. 95-96. He continued to isolate himself in his apartment staring at the television and continued to have problems with anger and lashing out at people and still had thoughts of hurting himself. R. 100-108. The Rosecrance treatment records contain similar reports, alongside some other reports

13

of improvement. The point here is not to resolve this question of whether the improvement was as much as each side claims, but merely to indicate that a deeper analysis is needed to address this baseline argument and also to ensure that all the contrary evidence was fully considered. For example, the ALJ cited to a treatment note stating that Plaintiff was "feeling better on meds," but the ALJ left out other facts from this same visit, including that Plaintiff was still having visual hallucinations ("shadows & ghost, space ships") and paranoia ("being watched"). R. 27, 535.

Another concern with the improvement theory is that it relies heavily on Plaintiff's subjective statements, much more so than on the assessment of the medical personnel. The discussion in Section I is relevant here. If the ALJ was correct that Plaintiff was prone to exaggeration, then it is possible that Plaintiff was also misperceiving, even overstating, the degree of improvement. As the ALJ noted, counselors at Rosecrance found Plaintiff "to be a poor historian and have low insight." R. 21. It is also possible that the episodic nature of Plaintiff's symptoms affected his self-assessments. According to the Mayo Clinic website, people with the bipolar type of schizoaffective disorder may have periods with an "increase in energy."[4] The Seventh Circuit has often noted how the waxing-and-waning nature of conditions like bipolar disorder can complicate the analysis. *See, e.g.*, *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (bipolar disorder "is by nature episodic and admits to regular fluctuations even under proper treatment"). Yet another concern, also not considered by the ALJ, is whether Plaintiff would be able to stay on his medications over the long haul. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("[M]ental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking her prescribed medicines

---

[4] Mayo Clinic, Schizoaffective disorder, https://www.mayoclinic.org/diseases-conditions/schizoaffective-disorder/symptoms-causes/syc-20354504 (last visited Dec. 18, 2020).

or otherwise submitting to treatment.") (internal citations omitted). The record contains several references to Plaintiff having trouble finding or re-filling medications. *See* R. 319, 353.

It is true that the ALJ's improvement rationale relied in part on a statement from Dr. Jafry's own opinion, specifically the following: "With compliance on meds mood swings under control, no panic attacks." R. 652. But the Court fails to see how this one statement undermines Dr. Jafry's opinion. As a preliminary point, this statement rests on the assumption that Plaintiff would be able to remain compliant (a fact not further discussed nor proven), and this statement only addresses improvement in one area (mood swings and panic attacks) and does not mention the hallucinations and other remaining symptoms. But more significantly, the ALJ did not explain why this one statement was incompatible with the rest of the report. If anything, Dr. Jafry's acknowledgement that some improvement had occurred strengthens her conclusions because it shows she did not ignore this evidence. The ALJ's attempt to re-interpret her report to draw a different bottom-line conclusion requires both cherrypicking and doctor playing.

**Rationale #3—Looking For Work.** The ALJ asserted that Dr. Jafry's opinion was contradicted by Plaintiff's alleged "plan to seek employment that may be affected by factors beyond his impairments." R. 28. Based on statements the ALJ made earlier in the decision, the particular "factor" being referred to here is Plaintiff's felony conviction. *See* R. 27 (at a December 28, 2017 visit with counselors, Plaintiff "listed barriers to employment, primarily felony conviction and pain"); *id.* ("On January 15, 2018, [Plaintiff and his counselors] discussed employers that hired individuals with legal history[.] He was hopeful and interested in seeking employment, and selected seven places on a resource list that he would consider working.").

This rationale relies on attenuated inferences only loosely supported by the record. In many cases, an attempt to work is viewed as a factor enhancing a claimant's credibility and is

15

also sometimes cited as a reason to rebut a possible malingering allegation. *See, e.g.*, *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("But a claimant's dogged efforts to work beyond her physical capacity would seem to be highly relevant in deciding her credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms.").

But in this case, the ALJ tries to flip these inferences on their head by offering a complicated two-step work around. In the first step, the ALJ concludes that Plaintiff was *able to* work full-time based on the mere fact that he was *looking for* work. This inference is questionable for several reasons. First, as Plaintiff points out, the record is unclear about whether he may have been seeking only a part-time job.[5] *See generally Weaver v. Berryhill*, 746 Fed. App'x. 574, 579 (7th Cir. 2018) ("This court has instructed ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment[.]"). Second, as noted above, the record suggests that Plaintiff had difficulties accurately assessing his limitations. Thus, even if he sincerely believed he could work, his belief might not have been realistic. *See Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016) (attempts to work might reflect an "overly-optimistic outlook rather than an exaggerated condition"). Here again, the ALJ accepted one of Plaintiff's statements at face value, not questioning it in any respect, even while elsewhere hinting that Plaintiff was making a larger effort to pretend that he couldn't work. Third, despite being "hopeful" that he could work, Plaintiff did not find any job.

Perhaps recognizing the problem presented by this proof-is-in-the-pudding argument, the ALJ added a second step to explain why Plaintiff did not find a job. The ALJ posited that

---

[5] One treatment note states that Plaintiff was, in fact, looking for part time work. R. 544 (March 16, 2018 visit: "I want to get a part time job. I might need help with a resume. I need help reading and writing. I'm very painful and it might get in my way—part is my body, part depression.").

16

Plaintiff's felony record was the reason. This explanation is not purely speculative. It is true that Plaintiff raised concerns with his counselors that his felony record might present an obstacle to his desire to find a job, but he also raised the concern that his disabilities (including pain from his physical impairments) would be a problem. R. 544. The ALJ ignored these other explanations. The ALJ also failed to acknowledge that the Rosecrance counselors expressed similar concerns. *See* R. 533 (noting that Plaintiff's problems finding work included problems with "literacy" and "comprehension").[6] In short, the ALJ failed to fully consider all the relevant evidence regarding these putative work attempts.

### III.     Remaining Arguments

Plaintiff has a few additional arguments that we have not addressed. For example, he argues that the ALJ failed to explain how he could do light work given his physical impairments (degenerative disc disease of the lumbar spine and osteoarthritis affecting his right hand). Because this Court finds that the arguments already discussed are sufficient to remand and because they represent Plaintiff's best arguments, the Court sees little benefit is going through the remaining arguments in any detail. Of course, on remand, the ALJ and the medical expert should fully consider all these issues, and Plaintiff's counsel should vigorously raise them to ensure that they are not waived in any subsequent appeal.

But there is one argument worth a brief further mention. Plaintiff complains that the ALJ did not adequately explain how the particular RFC limitations accounted for the moderate limitation findings from the paragraph B analysis. This Court agrees. Here is the explanation:

> Due to moderate limitations in concentration, persistence, or pace and understanding, remembering and carrying out instructions, the claimant is limited to understanding, remembering, and carrying out simple, routine and repetitive tasks, but not at a production rate pace (e.g. assembly line work). Due to moderate limitation

---

[6] Plaintiff did not have an email account. R. 533.

17

> interacting with others, he is able to interact with coworkers and the public only occasionally, but supervisors frequently.

R. 27-28. The ALJ did not explain why he adopted these particular limitations or connect them back to Plaintiff's specific problems. (Remember that ALJ did not call an expert at the hearing nor rely on the agency physicians who addressed the mental impairments.) Plaintiff had many cognitive and social problems, and it is not clear whether these limitations would account for them all and, if so, how. For example, there is some uncertainty in the record as to whether Plaintiff could read or write. The ALJ made a distinction between Plaintiff's ability to interact with supervisors (he could do so frequently) versus his ability to interact with coworkers and the public (only occasionally). But no reason is given for this distinction. These and other questions remain unanswered. More explicit analysis is needed, especially since the Seventh Circuit has given much attention to the issue of translating moderate findings of concentration, persistence, and pace into RFC limitations.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is reversed and remanded for further consideration.

Date: December 21, 2020         By: _____
                                    Lisa A. Jensen
                                    United States Magistrate Judge